Michael K. Hagemann (State Bar No. 264570)
1801 Century Park East
Suite 2400
Century City, CA 90067
Tel: (310) 499-4695
Fax: (310) 499-4796
mhagemann@mkhagemann.com

Attorney for Plaintiff
AQUA CONNECT, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| AQUA CONNECT, INC., a Nevada Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CODE REBEL LLC, a Hawaii Limited Liability Company; ARBEN KRYEZIU, an individual; VLADIMIR BICKOV; and DOES 1 through 300 inclusive,<br><br>Defendants. | Case No.: CV11-5764 RSWL (MANx)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Courtroom: 21<br><br>Judge: Hon. Ronald S. W. Lew<br><br>Complaint Filed: May 25, 2011 |

FIRST AMENDED COMPLAINT

## THE PARTIES

Plaintiff Aqua Connect, Inc. ("Plaintiff") hereby complains and alleges as follows:

1. Plaintiff is, and at all times mentioned in this Complaint was, a Nevada Corporation with its principal place of business in Los Angeles County, California.

2. Upon information and belief, Defendant Code Rebel LLC ("Code Rebel") is a Hawaii limited liability company with its principal place of business in Hawaii. Upon information and belief, Code Rebel has systematic and continuous ties to California, and also purposely availed itself to the benefits and protections of the state of California. Further, its actions in the State of California give rise to this action.

3. Upon information and belief, Defendant Arben Kryeziu is, and at all times mentioned in this Complaint was, a resident of Hawaii. Upon information and belief, Kryeziu has systematic and continuous ties to California, and also purposely availed himself to the benefits and protections of the state of California. Further, his actions in the State of California give rise to this action.

4. Upon information and belief, Defendant Vladimir Bickov is, and at all times mentioned in this Complaint was, a resident of Russia. Upon information and belief, Kryeziu has systematic and continuous ties to California, and also purposely availed himself to the benefits and protections of the state of California. Further, his actions in the State of California give rise to this action.

5. The true names and capacities, whether individual, corporate,

-1-
FIRST AMENDED COMPLAINT

partnership, associate or otherwise, of defendants DOES 1 through 300 inclusive, and each of them, are unknown to Plaintiff who therefore sues them by such fictitious names. Plaintiff will seek leave to amend this Complaint to show the true names and capacities of DOES 1 through 300 when it has discovered them. Plaintiff alleges that, at all times mentioned herein, all of the defendants acted or participated in some manner in the acts alleged herein, and in some way caused and are responsible for Plaintiff's damages. All references to the named defendant shall include, without limitation, DOES 1 through 300 inclusive.

## JURISDICTION AND VENUE

6. Plaintiff contends this action was improperly removed to federal court, this court lacks subject matter jurisdiction over this action, and that this action should have been remanded to the California state court in which it originated on October 12, 2011.

## STATEMENT OF FACTS

7. Plaintiff sells and markets software known as Aqua Connect Terminal Server ("ACTS").

8. On or around January 24, 2008, Vladimir Bickov, in his capacity as an agent of Code Rebel and at the behest of Arben Kryeziu, downloaded a trial version of ACTS.

9. In order to install the ACTS software, Bickov was required to agree to a written End User License Agreement ("EULA"). Bickov agreed to the EULA on behalf of Code Rebel. A true and correct copy of the EULA that was agreed to is

attached as Exhibit 1, and is hereby incorporated herein.

      10.    Upon information and belief, Code Rebel and its agents also requested trial versions of subsequent versions of ACTS, and agreed to the EULAs in effect at the time which were materially the same as Exhibit 1.

      11.    In each EULA, Code Rebel agreed not to reverse engineer the ACTS software.

      12.    All defendants colluded to reverse engineer ACTS.

      13.    On or around June of 2009, Code Rebel began distributing a competing software product, IRAPP TS, that was the result of the reverse engineering of ACTS, and Code Rebel continues to do so currently. A substantial number of Code Rebel's IRAPP TS customers are California citizens, and upon information and belief Code Rebel's website wherein the IRAPP TS software resides is physically located in California.

      14.    Defendants Kryeziu and Bickov have a long history of reverse engineering and/or misappropriating others' software.

## FIRST CLAIM
(Breach of Contract: As to All Defendants)

      15.    Plaintiff incorporates herein by reference paragraphs 1 through 14 of this Complaint.

      16.    The EULA was a written agreement that bound Code Rebel.

17. Code Rebel breached the EULA by reverse engineering ACTS.

18. Plaintiff performed all obligations under the agreement.

19. Code Rebel's breach caused Plaintiff to lose profits because some customers purchased the competing software program from Code Rebel.

20. Upon information and belief, Plaintiff lost over $10,000,000.00 in profit that it would have otherwise earned if Code Rebel did not breach its agreement.

21. With respect to future distribution, upon information and belief, damages would be insufficient because defendants do not have sufficient assets or income to compensate Plaintiff for the future harm likely to be borne by Plaintiff. Further, injunctive relief would avoid the necessity of a multiplicity of suits.

22. Code Rebel is an alter-ego for the other defendants. The defendants have failed to obey the LLC formalities, Code Rebel was insufficiently capitalized and insured, the other defendants have comingled funds with Code Rebel, and for the court to respect the limited liability status of Code Rebel would sanction a fraud.

## SECOND CLAIM
(False Promise: As to All Defendants)

23. Plaintiff incorporates herein by reference paragraphs 1 through 22 of this Complaint.

24. All of the defendants, as part of a conspiracy, made a promise to

Plaintiff that they would not reverse engineer ACTS.

25. That promise was important to the transaction.

26. All of the defendants intended at the time of making the promise to reverse engineer ACTS.

27. All of the defendants intended that Plaintiff rely on their promise.

28. Plaintiff did in fact reasonably rely on their promise.

29. All of the defendants conspired to reverse engineer ACTS.

30. Plaintiff was harmed because it lost profits because some customers purchased the competing software program from Code Rebel.

31. Plaintiff's reliance on defendants' promise was a substantial factor in causing that harm. If the defendants had not agreed to the EULA, Plaintiff would not have given them a copy of ACTS, and Code Rebel would have been unable to create a competing product and/or some of the features would have been missing from Code Rebel's product, making it less competitive.

32. Upon information and belief, Plaintiff lost over $10,000,000.00 in profit that it would have otherwise earned if the defendants did not break their promise.

## THIRD CLAIM

(Misappropriation of Trade Secrets: As to All Defendants)

33. Plaintiff incorporates herein by reference paragraphs 1 through 32 of this Complaint.

34. Plaintiff owned the following trade secrets: a detailed and specific method of implementing a terminal server in Mac OS X.

35. At the time of misappropriation by defendants, this was a trade secret.

36. All defendants knew at all relevant times that the contract with Plaintiff prohibited reverse engineering.

37. All defendants actively participated in improperly acquiring the Plaintiff's trade secret by reverse engineering in violation of said contract.

38. Each and every defendant actively participated in the disclosure of said trade secrets for personal monetary gain by selling the trade secrets to third parties.

39. Plaintiff was harmed because it lost profits because some customers purchased the competing software program from Code Rebel which utilized Plaintiff's trade secrets.

40. All of the defendants were unjustly enriched by the misappropriation when they all profited from a product that utilized Plaintiff's trade secrets.

41. All of the defendants' conduct was a substantial factor in causing that harm and unjust enrichment. Without the misappropriation of trade secrets, Code Rebel would have been unable to create a competing product and/or some of the features would have been missing from Code Rebel's product, making it less competitive and/or there would have been a material delay in the release of their product. All defendants profited from the products of Code Rebel.

42. Upon information and belief, Plaintiff lost over $10,000,000.00 in profit that it would have otherwise earned if the secrets were not misappropriated. Alternatively, upon information and belief, all defendants were enriched by at least $10,000,000.00 in profit that it would not have otherwise earned if the secrets were not misappropriated.

## FOURTH CLAIM

(California Business and Professions Code § 17200: As to All Defendants)

43. Plaintiff incorporates herein by reference paragraphs 1 through 42 of this Complaint.

44. The acts and practices alleged to have been committed by the defendants above constitute unlawful, unfair, and fraudulent business acts or practices within the meaning of section 17200 of the Business & Professions Code.

45. As a result of the unlawful, unfair, and fraudulent business acts or practices of the defendants, Plaintiff suffered damages by losing substantial profits.

46. Argued in the alternative for each defendant, each defendant received a profit of at least $10,000,000.00, as a result of their unlawful, unfair, and

-7-
FIRST AMENDED COMPLAINT

fraudulent business acts or practices at the expense of Plaintiff.

## FIFTH CLAIM

(Unjust Enrichment: As to All Defendants)

47. Plaintiff incorporates herein by reference paragraphs 1 through 46 of this Complaint.

48. For all the reasons explained above, all defendants were unjustly enriched.

49. Argued in the alternative for each defendant, each defendant received a profit of at least $10,000,000.00, as a result of their unlawful, unfair, and fraudulent business acts or practices at the expense of Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against the named defendants as follows:

**FIRST CLAIM**

1. For contract damages of at least $10,000,000.00 according to proof.

2. For specific performance in the form of an injunction restraining all defendants from distributing the fruits of their reverse engineering, which includes but is not limited to: the source code of ACTS, the source code/compiled version of Code Rebel's terminal server product, IRAPP TS, and any and all software *products* that are a

derivative of IRAPP TS or ACTS.

    3.    For attorney's fees.

**SECOND CLAIM**

    4.    For damages of at least $10,000,000.00 according to proof.

    5.    For an injunction restraining all defendants from distributing the fruits of their reverse engineering, which includes but is not limited to: the source code of ACTS, the source code/compiled version of Code Rebel's terminal server product, IRAPP TS, and any and all software products that are a derivative of IRAPP TS or ACTS.

    6.    For punitive damages.

**THIRD CLAIM**

    7.    For damages of at least $10,000,000.00 according to proof.

    8.    In the alternative, for restitution of illicit profits in the amount of at least $10,000,000.00 according to proof.

    9.    For an injunction restraining all defendants from distributing the fruits of their reverse engineering, which includes but is not limited to: the source code of ACTS, the source code/compiled version of Code Rebel's terminal server product, IRAPP TS, and any and all software products that are a derivative of IRAPP TS or ACTS.

10. For punitive damages.

**FOURTH CLAIM**

11. For disgorgement of profits of at least $10,000,000.00 according to proof.

12. For an injunction restraining all defendants from distributing the fruits of their reverse engineering, which includes but is not limited to: the source code of ACTS, the source code/compiled version of Code Rebel's terminal server product, IRAPP TS, and any and all software products that are a derivative of IRAPP TS or ACTS.

**FIFTH CLAIM**

13. For restitution of illicit profits in the amount of at least $10,000,000.00 according to proof.

14. For an injunction restraining all defendants from distributing the fruits of their reverse engineering, which includes but is not limited to: the source code of ACTS, the source code/compiled version of Code Rebel's terminal server product, IRAPP TS, and any and all software products that are a derivative of IRAPP TS or ACTS.

**ALL CLAIMS**

15. For prejudgment interest.

-10-
FIRST AMENDED COMPLAINT

16. For costs of suit incurred in this action.

17. For such other and further relief as the court deems proper.

DATED: October 19, 2011

By: _____
Michael K. Hagemann
Attorney for Plaintiff, AQUA CONNECT, INC.

-11-
FIRST AMENDED COMPLAINT

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial pursuant to Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: October 19, 2011

By: /s/
Michael K. Hagemann
Attorney for Plaintiff, AQUA CONNECT, INC.

# Exhibit 1

AQUA CONNECT, INC.
Software License Agreement

AQUA CONNECT, INC ("Licensor") IS WILLING TO LICENSE THE ENCLOSED SOFTWARE AND DOCUMENTATION (the "Software") TO YOU ("You OR Licensee") ONLY ON THE CONDITION THAT YOU ACCEPT ALL OF THE TERMS IN THIS LICENSE AGREEMENT (the "Agreement").  IF YOU ARE AN EMPLOYEE OR AGENT OF A COMPANY (The "Company") AND ARE ENTERING INTO THIS AGREEMENT TO OBTAIN THE SOFTWARE FOR USE BY THE COMPANY FOR ITS OWN BUSINESS PURPOSES, YOU HEREBY AGREE THAT YOU ENTER INTO THIS AGREEMENT ON BEHALF OF THE COMPANY AND THAT YOU HAVE THE AUTHORITY TO BIND THE COMPANY TO THE TERMS AND CONDITIONS OF THIS AGREEMENT.
BY CLICKING ON THE "ACCEPT" BUTTON BELOW, YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, UNDERSTAND IT, AND AGREE TO BE BOUND BY IT.  IF YOU DO NOT AGREE TO ANY OF THE TERMS BELOW, LICENSOR IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, AND YOU SHOULD CLICK ON THE "DO NOT ACCEPT" BUTTON BELOW TO DISCONTINUE THE INSTALLATION PROCESS.  IN SUCH CASE, ANY AMOUNTS ALREADY PAID BY YOU, IF ANY SHALL BE REFUNDED BY LICENSOR.

NOW THEREFORE, in consideration of the foregoing recitals and the terms and provisions set forth below, the receipt and sufficiency of which consideration is hereby acknowledged, the parties agree that Licensor agrees to license the Software to Licensee upon the terms and subject to the conditions set forth below:

1) LICENSE TERM.

(a) The Term of the License Agreement (the "License Period") is perpetual.  However, Support & Maintenance, if purchased, will only be provided up to one (1) year from the date of purchase.

2) DELIVERY AND INSTALLATION OF THE SOFTWARE.

(a) Licensor shall deliver the download link via email to Licensee on the date of purchase (the "Deliver Date").

3) SOFTWARE   MAINTENANCE AND INSTALLATION SUPPORT.

    (a) Licensee agrees that Standard Support & Maintenance Materials have been provided to Licensee prior to entering into this Agreement.   Licensee further understands and agrees to all Support & Maintenance terms as per the Support & Maintenance Materials.   Licensee should not enter into this Agreement if Licensee has not received the agreed upon Support & Maintenance Materials.

    (b) Licensor agrees to offer installation tech support only related to the

installation and configuration of the Software to Licensee within the first Ten (10) days from Delivery Date of the Software ("Installation Tech Support").   Licensor will offer Installation Tech Support via phone or electronic delivery only and the Installation Tech Support will be offered only during normal business hours of 9:00AM - 5:00PM, Pacific Standard Time, Monday-Friday.

4) SOFTWARE LICENSE.

(a) Licensor grants to Licensee a limited, nonexclusive license to use the Software for the duration of the License Period. For purposes of this Agreement, the licensed Software shall include the Software as delivered to Licensee, including but not limited to, appropriate documentation and information provided by Licensor to Licensee under this Agreement.

(b) Licensee acknowledges that the Software is the property of Licensor and that the Software is being made available to Licensee in confidence and solely on the basis of its confidential relationship to Licensor. Licensee further agrees to use best efforts to prevent Licensee's employees or vendors from printing, copying, providing or otherwise making the Software available, in whole or in part, for any of the employees' or vendors' private use outside the scope of Licensee's business or to any third parties.

(c) Licensee shall not reverse engineer, reverse compile or disassemble the Software, or otherwise attempt to derive the source code to the Software.   Licensee shall have no right to, and shall not, sublicense any of its rights under this Agreement. Furthermore, Licensee agrees not to "clean room design" the Software or publish any "benchmarking" results of the Software.

(d) Licensee's license to use the Software will expire and will automatically be revoked upon a breach of this Agreement by Licensee. Licensee also agrees and acknowledges that updates may become available to Licensee during the License Period.   However, new upgrades and versions of the Software will require Licensee to sign a new License Agreement and pay an additional fee, if applicable.

(e) Licensee acknowledges and understands that in order for this Software License Agreement to be valid, Licensee is required to have the appropriate Apple Mac OS X Server license.

5) WARRANTIES.

(a) Licensor warrants that the Software that is delivered to Licensee will be free from defects for a period of Thirty (30) days (the "Warranty Period") from the date of delivery.   Licensor further warrants that the Software will perform as outlined in the current documentation available on the Software, at the time of delivery, for the entire Warranty Period.   Licensee's sole remedy in the event of a breach of warranty will be that Licensor will, at its option, after best efforts to resolve the breach, replace the defective item within the Warranty Period or refund the money paid by Licensee to

Licensor for the defective item only.

(b) The warranties contained in this Agreement will not apply to the Software which:
(i) has been altered, supplemented, upgraded or modified in any way by Licensee; or
(ii) has been repaired except by Licensor or its designee.

(c) Additionally, the warranties contained in this Agreement do not apply to repair or replacement caused or necessitated by: (i) events occurring after risk of loss passes to Licensee, such as loss or damage during shipment; (ii) acts of God, including without limitation natural acts such as fire, flood, wind, earthquake, lightning or similar disaster; (iii) improper use, environment, installation or electrical supply, improper maintenance, or any other misuse, abuse or mishandling; (iv) governmental actions or inactions; (v) strikes or work stoppages; (vi) Licensee's failure to follow applicable use or operations instructions or manuals; (vii) Licensee's failure to implement, or to allow Licensor or its designee to implement, any corrections or modifications to the Software; or (viii) such other events outside Licensor's reasonable control.

(d) EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, THERE ARE NO EXPRESS WARRANTIES, WHICH EXTEND BEYOND THE DESCRIPTION SET FORTH IN THIS AGREEMENT.

(e) IN NO EVENT SHALL LICENSOR BE LIABLE TO LICENSEE FOR LOSS OF PROFITS ARISING OUT OF ANY CLAIMED BREACH BY LICENSOR OF ITS OBLIGATIONS HEREUNDER.

(f) The Licensor understands that Licensee may use certain third party software and/or equipment in conjunction with the Software.   LICENSOR MAKES NO WARRANTIES OR REPRESENTATIONS FOR THE SOFTWARE, INCLUDING BUT NOT LIMITED TO THOSE IN THIS AGREEMENT, EXPRESS OR IMPLIED, AS TO THE QUALITY, CAPABILITIES, OPERATIONS, PERFORMANCE OR SUITABILITY OF THE THIRD PARTY SOFTWARE AND/OR EQUIPMENT, INCLUDING THE ABILITY TO INTEGRATE THE SAME WITH THE SOFTWARE.   THE QUALITY, CAPABILITIES, OPERATIONS, PERFORMANCE AND SUITABILITY OF THE THIRD PARTY SOFTWARE AND/OR EQUIPMENT LIE SOLELY WITH THE LICENSEE AND THE VENDOR OR SUPPLIER OF SUCH THIRD PARTY SOFTWARE AND/OR EQUIPMENT, AS THIS CASE MAY BE.

(g) *Licensor* discloses that the Software is protected by United States copyright and patent pending laws and applicable international treaties and/or conventions.

6) REMOVAL OF SOFTWARE

(a) Licensee understands and agrees that the Software is solely owned by Licensor.

(i)     (b) Licensee must destroy any and all copies of the Software beyond recovery from Licensee's computer system(s) at the sole cost to Licensee immediately following any breach of this Agreement by Licensee.

7) COMPLIANCE WITH LAWS.

(a) Licensee shall, at its own expense, use the Software in a careful and proper manner and shall comply with and conform to all laws, ordinances and regulations in any way relating to the possession, use and/or maintenance of the Software.

(b) Licensees using the Software in North America must use the Software in North America only. Unless specifically authorized in writing by Licensor, North American Licensees shall not export, or in any way transfer the Software to any destination outside North America without the prior written consent of Licensor. Regardless of any disclosure made by Licensee to Licensor of an ultimate destination of the Software, Licensee shall not export either directly or indirectly, the Software without first obtaining a license to re-export from the United States Government, as required, and will comply with United States Government export regulations, as applicable.

8) DEFAULT.

(a) The following will result in a default by Licensee, including but not limited to:

(i) Licensee shall default in any payment due under this Agreement.
(ii) Licensee breaches Licensee's duty of confidentiality.
(iii) Licensee fails to use best efforts to prevent Licensee's employees or vendors from printing, copying, providing or otherwise making the Software available, in whole or in part, for any of the employees' or vendors' private use or to any third parties.
(iv) Licensee reverse engineers, reverse compiles or disassembles the Software, or otherwise attempts to derive the source code to the Software.
(v) Licensee sublicenses any of its rights under this Agreement.
(vi) Licensee fails to comply with any law while using the Software.

9) MISCELLANEOUS.

(a) Waiver of Rights. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior or subsequent breach of the same provision or a waiver of any breach of any other provision. No waiver shall be effective unless made in writing and signed by an authorized representative of each party hereto.

(b) Governing Law. This Agreement shall be governed by and construed and enforced according to the laws of the State of California, U.S.A. This Agreement contains the entire, integrated Agreement between the parties, and shall be binding upon both parties and their respective heirs, successors and permitted assigns.

(c) Date of Effectiveness. This Agreement shall become binding and effective as

of the date as listed above.

(d) Headings. Section headings are inserted for convenience only and shall not be used in any way to construe the terms of this Agreement.

(e) Severability. If any immaterial provision of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

(f) Notices. Except as otherwise provided, any notice, request, demand, consent or other communication provided or permitted hereunder will be deemed given on the date it is sent and will be in writing and delivered by personal delivery, by certified mail, or by ordinary mail, postage prepaid, addressed to the party for which it is intended at the party's address as indicated in the heading of this Agreement and until such time as either party has given the other notice of a change of address.

(g) Provisional Conflicts. In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any exhibit or schedule annexed hereto or any document referred to herein including but not limited to the maintenance agreement for the Software, the provisions of this Agreement will prevail and govern the interpretation thereof.

(h) Attorneys' Fees.  In the event that one party brings suit against the other party for any matter arising out of or in connection with this Agreement, and the party which is sued is ultimately adjudicated to not have liability, then the party bringing suit agrees to pay the other party's reasonable attorneys' fees and litigation costs.

(i) Force Majeure. No party shall be liable for delay in performance hereunder due to causes beyond its control including, but not limited to, acts of God, fires, strikes, delinquencies of manufacturers or suppliers or acts of war. However, each party undertakes to minimize any such delay to the extent possible.

(j) Amendments.  This Agreement may only be amended or modified by written instrument executed by all parties.

(k) Plurality.  The use of singular usage shall include the plural usage and the use of the plural usage shall include the singular usage, especially when referring to the Software. In the event Licensee has purchased more than one copy of Software this Agreement will refer to all Software purchased by Licensee in this Agreement.

(l) Third Party Rights.  The parties do not intend the benefits of this Agreement to inure to any person or entity not a party or signatory to this Agreement.